**United States District Court**
For the Northern District of California

1
2
3              UNITED STATES DISTRICT COURT
4              NORTHERN DISTRICT OF CALIFORNIA
5                     OAKLAND DIVISION
6
7  RAHSAAN COLEMAN,
8              Petitioner,            No. C 04-4069 PJH (PR)
9    vs.                             **ORDER DENYING PETITION**
                                     **FOR WRIT OF HABEAS**
10  JOE McGRATH, Warden,             **CORPUS AND DENYING**
                                     **CERTIFICATE OF**
11             Respondent.           **APPEALABILITY**
12  _____/
13         This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. §

14  2254.  The court ordered respondent to show cause why the writ should not be granted.

15  Respondent has filed an answer and a memorandum of points and authorities in support of

16  it, and has lodged exhibits with the court.  Petitioner has responded with a traverse.  For

17  the reasons set out below, the petition is denied.

18                              **BACKGROUND**

19         A Contra Costa County jury convicted petitioner of voluntary manslaughter with a

20  gun enhancement and possession of a concealed weapon by an ex-felon.  He was

21  sentenced to prison for a term of fifty-nine years to life.  The California Court of Appeal

22  affirmed his conviction and the California Supreme Court denied his petition for review.

23         He does not dispute the following facts, which are excerpted from the opinion of the

24  California Court of Appeal:

25              Appellant and the victim, Myron Parker, were embroiled in an enduring,
           intermittently hostile relationship.  Parker's sister, Athena Nelson, was appellant's
26         girlfriend beginning in 1989.  Athena and appellant lived together in Richmond, and
           Parker often stayed with them or lived nearby.  Parker and appellant repeatedly
27         engaged in arguments over appellant's treatment of Athena.  Appellant and his
           stepbrother, Joseph Adrow, considered Parker an "arrogant, uppity, bully type
28         individual," a "gunslinger," who often engaged in fights and violent acts.  Appellant
           also described Parker as a "drug dealer" with a reputation in the community for

carrying guns and "bullying individuals." Appellant and other witnesses testified that they frequently saw Parker in possession of guns. Contrary testimony was also adduced that while Parker was known to engage in fist fights, he did not typically use guns.

In 1991, Parker accused appellant of stealing money and jewelry from him, and they "continued to argue about it." In early 1992, appellant awoke to find Parker standing over him with a .357 handgun. When appellant asked Parker, "what he was doing," Parker "smirked and said, 'Well, I could have had you.'" On two occasions in 1992, Parker intervened when appellant was "beating . . . up" Athena and forced him out of the house, which resulted in "fighting" between them outside. According to appellant, during one of these incidents Parker's cousin Nerbert interceded on appellant's behalf, whereupon Parker and Nerbert "started fighting blows to blows." Parker then retrieved an assault rifle from inside the house, and threatened to "smoke" appellant. After Parker's cousin Darius "snatched" the gun away, Parker became enraged and broke the front windshield of the car in which appellant was sitting, shattering glass onto the face of the baby daughter of appellant's sister Rolanda. Athena testified that she never saw Parker use a weapon in any of his confrontations with appellant.

Later in 1992, Parker's sister Latasha, who was then married to Joseph Adrow, accused appellant of sexually assaulting her. Appellant pled guilty to sexual assault, although he claimed the sexual relationship with Latasha was consensual.

The antagonism between appellant and Parker escalated in November of 1993, when appellant and two friends decided to burglarize Parker's home to steal money and drugs from his safe. They thought Parker would not be home, and did not intend for anyone to be hurt. Appellant and his accomplices wore ski masks and were armed when they approached and kicked the front door. Parker was inside, and shot at them, killing appellant's best friend. Appellant returned fire before he fled. Appellant was armed and in possession of cocaine when he was arrested two weeks later. He denied complicity in the crimes when he gave a statement to the police, but later pled guilty to attempted burglary and attempted robbery, with use of a gun. He was sentenced to four years in state prison.

Appellant testified that while he served his prison term between 1993 and 1997, he adopted the Islam faith and way of life. He did not blame Parker for the death of his friend or his prison sentence. However, appellant was told by his sister that Parker said, "when your brother get[s] out of jail that he's going to have to answer to me."

When appellant was released from prison in July of 1997, he planned to continue his education, get a job, and move into his own apartment. Appellant told Latasha he had "become religious" and "wanted to make peace" with Parker. He asked Latasha to propose a meeting with Parker to "discuss the things that happened in the past so we can put it behind us." Appellant did not receive a response directly from Parker, but he was advised by others to avoid Parker, who was carrying guns and "out looking" for him. Appellant was "scared," so he obtained a gun for "protection" about a week after he left prison. Thereafter, every time appellant left the house he took the gun with him.

On the afternoon of July 31, 1997, two weeks after his release, appellant was at his parents' home in North Richmond with Joseph Adrow and younger sister Lynetta. Latasha visited briefly, then asked Adrow to accompany her to the Martin

Luther King Center (hereafter the Center) to pick up her daughter at "day camp." Joseph agreed to go, and appellant asked to "ride along" with them to "just get up out and about" and "hang" with his brother.  Appellant knew that Parker often "hung out" on Third and Maine near the Center, but he did not perceive any danger in the trip there with Joseph and Latasha.  Nevertheless, appellant carried the loaded gun in his waistband.

On the way to the Center, appellant observed Parker among a group of 15 or 20 persons, and became "spooked." Upon arrival at the Center, Latasha immediately went inside to locate her daughter. Parker approached the car from across the street. Adrow noticed that Parker kept his left hand in a clenched fist under his shirt; he thought Parker "had a gun." Even so, he counseled appellant to "talk to the man. Tell him where your head is at." Adrow then accompanied Latasha inside the Center, but "kept looking outside to see what was going on" with appellant and Parker.

Appellant testified that he extended his hand to Parker and said he "came in peace," whereupon Parker punched him in the nose, causing him to stagger back into a railing. Parker appeared to appellant to be angry and aggressive. Appellant declared that he "didn't come here for that," but Parker replied, "Nigger, I ain't trying to hear that shit." Latasha and Adrow witnessed the altercation, so they went outside. Latasha asked Parker to "let it go," but he refused and told her to "get out of the way." Latasha then returned with Adrow to the Center to get her daughter.

Appellant "just wanted to get away from" Parker, so he also went inside the Center, where he asked the receptionist to call a cab. Parker followed; he looked at Adrow and asked, "What you got to do with this. I do you too." Parker then hit Adrow, who did not respond. Parker said he was "going to do both of you," or "dump on you now," which appellant and Adrow interpreted as a threat to shoot them. They testified that Parker continued to hold his left hand under his shirt like he was keeping a gun there.

Appellant "just wanted to get out of there," so he again asked the receptionist to call a cab. Appellant and Adrow proceeded to walk away, but Parker mentioned that he had "a posse" on the way to "get rid" of them, and would not let them leave. Adrow testified that Parker then knocked appellant to the floor, and when appellant arose he "looked like he was dazed." Appellant did not "recall being hit" a second time, although he later realized he had a cut on his nose and "a couple of cuts" on his lips and gums. Parker stood in front of them behind a couch, obstructing their exit from the building.

Appellant extracted the gun from his shirt, and briefly put it behind his leg. According to appellant, Parker continued to advance toward him, pushing the couch forward and "tugging at his waistband." Parker "ducked down" behind the couch when he noticed appellant's gun; he still had his left hand inside his jacket. Although appellant did not see the victim "pull anything" out of his jacket, he feared that Parker "was going to come up with a gun." When Parker "popped back up," appellant lifted his gun and fired a single shot at him.

Latasha testified that she was "looking at the sign-out sheet," and did not actually see the shooting.  She heard appellant say, "I know, Myron," in response to Parker's proclamation that he had "a posse on the way," followed by a gunshot.  She looked up and saw appellant holding his gun, pointed at the floor.  After the shot was fired, Parker ran toward swinging glass doors behind the reception desk, but collapsed inside the building. He died from a single gunshot wound to the chest, that was fired from slightly above him.  Parker did not have any injuries that were

3

1    consistent with hitting anyone.  He was not found in possession of any weapon.

2         After firing the shot, appellant racked his gun "just in case" Parker returned,
3    then he and Adrow fled from the building in another direction through the main
     doors.  Neither appellant nor Adrow knew whether the shot had hit Parker. Appellant
4    claimed that he did not intend to kill Parker, and only shot to prevent the victim from
     killing him or Adrow.

5         Zakiya Anderson, the receptionist at the front desk of the Center, testified at
6    trial that she only heard the shot fired from "the gym area," but did not observe or
     recall any of the events that precipitated it. When she spoke to police officers the
7    days of the shooting, however, Anderson said that she witnessed Parker curse at
     appellant and Adrow, threaten to "beat" them and hit Adrow more than once.
8    According to Anderson's statement, appellant produced a semi-automatic handgun
     from his waist, held it briefly while the argument continued, then raised and pointed it
9    in the direction of Parker. Parker ran toward the activity room, whereupon Anderson
     heard a shot.

10        Dana Brookins, a teaching assistant at the Center, was reading a story to
11   children in a classroom when she heard a "boom" and ran to the door.  She
     observed a man with a gun, "bringing it back up."  She exclaimed, "there's kids in
12   here," and the man ran out of the building.

13        Appellant and Adrow returned to their house by cab.  The police arrived
     contemporaneously, and appellant accompanied the officers to the station, where he
14   agreed to make a statement. Both appellant and Adrow gave initial accounts of the
     incident that referred to the argument, Parker's threats and their fear of being killed
15   by him, but they falsely told the police "some other guy came in at the last minute" to
     shoot Parker.  In subsequent statements, they acknowledged that appellant was the
16   one who did the shooting.  At appellant's request, Adrow took the investigating
     officer to an apartment complex near their residence where appellant had concealed
17   the gun under a staircase wrapped in a shirt beneath a stack of tires and an ice
     chest.  The gun had a live 9-millimeter round in the chamber and an attached
18   magazine with seven additional rounds of ammunition. A shell casing found at the
     Center was matched to appellant's gun.

19
20   Ex. 7 (opinion of the California Court of Appeal) at 2-6.

21                            **STANDARD OF REVIEW**

22        A district court may not grant a petition challenging a state conviction or sentence on

23   the basis of a claim that was reviewed on the merits in state court unless the state court's

24   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

25   unreasonable application of, clearly established Federal law, as determined by the

26   Supreme Court of the United States; or (2) resulted in a decision that was based on an

27   unreasonable determination of the facts in light of the evidence presented in the State court

28   proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

4

mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*,  537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000).

**DISCUSSION**

**I.    Claims**

As grounds for habeas relief, petitioner asserts that (1) His due process and jury trial rights were violated by the trial court's refusal to give a proposed jury instruction regarding the "fear of imminent danger" element of self defense; (2) His due process and jury trial

5

United States District Court

For the Northern District of California

1  rights were violated by the trial court's refusal to give his proposed instruction regarding the

2  amount of force that can be used in self-defense; (3) His due process and effective

3  assistance of counsel rights were violated by counsel's failure to present evidence that

4  petitioner was concussed and thus unconscious when he shot the victim; (4) His due

5  process rights were violated by the trial court's denial of his motion for new trial on grounds

6  of newly-discovered evidence that he suffered from post-traumatic stress syndrome, or

7  alternatively, his counsel was ineffective in failing to discover that evidence and present it at

8  trial; (5) His three-strikes sentence of fifty-nine years to life violated his Eighth Amendment

9  rights; (6) The consecutive terms imposed on two of the charges violated his double

10  jeopardy rights; and (7) The gun enhancement violated his double jeopardy rights.

11      **A.    Jury Instructions**

12      Petitioner's first two issues involve jury instructions.  The trial court gave CALJIC No.

13  5.12, on the requisite emotion justifying self-defense, and CALJIC Nos. 5.30 and 5.50, on

14  the amount of force that can be used in self-defense.  The court refused to give petitioner's

15  proposed instructions as to each of these points.  Petitioner contends that his due process

16  rights and his right to have the jury consider his theory of defense were violated by the trial

17  court's refusal to give his proposed instructions.

18      **1.    Standard**

19      Petitioner contends in both his instructional claims that failure to give his proposed

20  instructions violated due process and his Sixth Amendment rights.  Whether grounded in

21  the Sixth Amendment's guarantee of compulsory process or in the more general Fifth

22  Amendment guarantee of due process, "the Constitution guarantees criminal defendants 'a

23  meaningful opportunity to present a complete defense.'"  *Holmes v. South Carolina*, 547

24  U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)); *see California

25  v. Trombetta*, 467 U.S. 479, 485 (1984) (due process); *Chambers v. Mississippi*, 410 U.S.

26  284, 294 (1973) (compulsory process).   Therefore, a criminal defendant is entitled to

27  adequate instructions on the defense theory of the case. *See Conde v. Henry*, 198 F.3d

28  734, 739 (9th Cir. 2000) (error to deny defendant's request for instruction on simple

1   kidnaping where such instruction was supported by the evidence).

2                    **2.      Instruction on Requisite Emotion**

3          The parties agree that this instruction was requested by the defense: "If the killing

4   would be justified by a reasonable fear that there was imminent danger of death or great

5   bodily injury, then the use of deadly force in self-defense would be proper, regardless of

6   what other emotions the party who kills may be feeling, but not acting upon."  Am. Compl.

7   at 8; Resp't  Answer P. & A. at 5.

8          This is the instruction the court gave:

9          The killing of another person in self-defense is justifiable and not unlawful
           when the person who does the killing actually and reasonably believes:
10
                  1.) That there is an imminent danger that the other person will either
11                kill him or cause him great bodily injury; and
                  2.) That it is necessary under the circumstances for him to use in self-
12                defense force or means that might cause the death of the other person
                  for the purpose of avoiding death or great bodily injury to himself.
13
                  A bare fear of death or great bodily injury is not sufficient to justify a
14         homicide. To justify taking the life of another in self-defense, the
           circumstances must be such as would excite the fears of a reasonable person
15         placed in a similar position, and the part – the party killing must act under the
           influence of those fears alone. The danger must be apparent, present, and
16         instantly dealt with, or must so appear at the time to the slayer as a
           reasonable person, and the killing must be done under a well-founded belief
17         that is necessary to save one's self from death or great bodily harm.

18   Ex. 2, Vol. VII at 1146-47.

19         Petitioner alleges that the trial court's refusal to supplement the given jury

20   instructions with his requested jury instruction deprived him of his Sixth Amendment and

21   due process rights because the requested instruction "was a correct statement of law

22   concerning a crucially important issue in petitioner's case," "the principles stated in the

23   refused instruction were not adequately covered by any other instructions given," and the

24   refused instruction would have highlighted the fact that a defendant seeking to use a self-

25   defense theory may be feeling other emotions toward the victim, in addition to fear, so long

26   as those other emotions did not cause the use of force.  Am. Compl. at 8-11.

27         Petitioner is wrong on these points:  For one, the court of appeal, whose holding as

28   to state law is binding on this court, *see Bradshaw v. Richey*, 546 U.S. 74, 76 (2005), held

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1    that "the instruction was not an entirely accurate statement of the law, as it failed to

2    properly convey the principle that fear of imminent harm must be the *only* cause of the

3    killing." Ex. 7 at 10 (italics in original).  For another, the instruction that was given told the

4    jury that "the party killing must act under the influence of those fears [of imminent death or

5    injury such as a reasonable person would have] alone," thus covering the point that

6    emotions that were not acted upon were irrelevant to whether the killing was in self-

7    defense. Ex. 2, Vol. VII at 1146.  And as to petitioner's contention that his proposed

8    instruction would have highlighted his point that any hostility he felt towards the victim was

9    irrelevant as long as he did not act on it, he was not entitled to have jury instructions in his

10   precise terms where the given instructions adequately embodied the defense theory.  *See*

11   *United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996).  There was no constitutional

12   violation.

13        Additionally, even assuming constitutional error arguendo, it was harmless.  The

14   applicable harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U.S. 619

15   (1993).  *Brecht* forbids a grant of habeas relief for a trial-type error unless the error had a

16   "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507

17   U.S. at 637-38.  The instruction given by the court covered the point petitioner advocates;

18   because juries are presumed to follow their instructions, and so must have followed the

19   instruction that was given, failure to give the repetitious instruction could not have

20   prejudiced petitioner.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (jury presumed to

21   follow its instructions).

22        For the above reasons, the state appellate court's rejection of this claim was not

23   contrary to, or an unreasonable application of, clearly established United States Supreme

24   Court authority.  Petitioner is not entitled to habeas relief as to this claim.

### 3.    Instruction on Force in Self-Defense

26        Petitioner further claims that the trial court violated his Sixth Amendment and due

27   process rights by denying his request for an additional, clarifying instruction on the amount

28   of force used on the victim, additional to CALJIC Nos. 5.30 and 5.50, which were given.

United States District Court

For the Northern District of California

1    The parties agree that this instruction was requested by the defense:  "If the

2  appearances are such as to justify a reasonable man in believing that the defendant

3  believed it was necessary to kill another in order to prevent death or great bodily injury to

4  himself, he is not required to exercise any due caution or circumspection as to the manner

5  of the force that he uses against his aggressor.  The law does not require that the

6  defendant resort to less dramatic means to secure his safety."  Am. Compl. at 13; Resp't's

7  Answer, P. & A. at 8.

8    The court gave this instruction:  "It is lawful for a person who is being assaulted to

9  defend himself from attack if, as a reasonable person, he has grounds for believing and

10  does believe that bodily injury is about to be inflicted upon himself.  In doing so, that person

11  may use all force and means which he believes to be reasonably necessary and which

12  would appear to a reasonable person, in the same or similar circumstances, to be

13  necessary to prevent the injury which appears to be imminent."  Ex. 2, Vol. VII (Reporter's

14  Transcript) at 1148-49.  The court also gave:  "A person threatened with an attack that

15  justifies the exercise of the right of self defense need not retreat.  In the exercise of his right

16  of self-defense such person may stand ground and defend himself by the use of all force

17  and means which would appear to a reasonable person in a similar situation and with

18  similar knowledge; and such person may pursue such assailant until he has secured

19  himself from danger if that course of action likewise appears reasonably necessary."  *Id.* at

20  1149.

21    Petitioner alleges that the trial court's refusal to give his requested jury instruction

22  violated his Sixth Amendment and due process rights because the requested instruction

23  "was a correct statement of law concerning a significant issue in petitioner's case"  and "the

24  principles stated in the refused instruction were not adequately covered by any other

25  instructions given."  Am. Compl. at 13-15.

26    The court of appeal noted that "[t]he jury was already aware from the instructions

27  actually given of [petitioner's] right to use deadly force if reasonably necessary to repel the

28  attack."  Ex. 7 at 11.  The court concluded that the instructions that were given were

United States District Court

For the Northern District of California

"proper" under California law, that repetitious instructions were not necessary, and that the trial court was correct to reject the requested instruction. *Id.* This court agrees that the instructions that were given adequately covered the point petitioner sought to make with his proposed instruction, and as noted above, he had no right to emphasize that point with duplicative instructions. *See United States v. Del Muro*, 87 F.3d 1078, 1081 (9th Cir. 1996) (defendant not entitled to jury instructions in his precise terms when instructions given adequately embodied the defense theory). There was no constitutional violation.

For the foregoing reasons, the trial court's refusal to give the proposed jury instruction was not contrary to, or an objectively unreasonable application of, any clearly established Federal law as determined by the United State Supreme Court. *See* 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on ground two of the petition.

**B.   Ineffective Assistance**

Petitioner's third and fourth issues are claims that his trial counsel was ineffective. He contends that counsel was ineffective in failing to present evidence that he was unconscious when he shot the victim and in not presenting a defense based on mental disorder.

**1.   Standard**

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, the petitioner must establish that he or she was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's

**United States District Court**

For the Northern District of California

1   representation was within the 'wide range' of reasonable professional assistance. *Id.* at

2   689.

3         The *Strickland* prejudice analysis is complete in itself.  Therefore, there is no need

4   for additional harmless error review pursuant to *Brecht v. Abrahamson*, 507 U.S. 619, 637

5   (1993).  A federal habeas court considering an ineffective assistance claim need not

6   address the prejudice prong of the *Strickland* test "if the petitioner cannot even establish

7   incompetence under the first prong." *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir.

8   1998).  Conversely, the "court need not determine whether counsel's performance was

9   deficient before examining the prejudice suffered by the defendant as a result of the alleged

10   deficiencies." *Strickland*, 466 U.S. at 697.

11         Establishing that a state court's application of *Strickland* was unreasonable under

12   § 2254(d) is all the more difficult.  "Under AEDPA, a state court must be granted a

13   deference and latitude that are not in operation in a case involving direct review under

14   *Strickland*." *Harrington v. Richter*, 131 S.Ct. 770, 778 (2011).  The standards created by

15   *Strickland* and § 2254(d) are both 'highly deferential' and when the two apply in tandem,

16   review is 'doubly' so. *See Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997).  This test is

17   "difficult to meet" and a state court's determination that a claim lacks merit "precludes

18   federal habeas relief so long as fair-minded jurists could disagree on the correctness of that

19   decision." *Harrington*, 131 S. Ct. at 778 (2011).  Thus, the question under § 2254 is not

20   whether the counsel's actions were reasonable, but whether there is any reasonable

21   argument that counsel satisfied *Strickland*'s deferential standard. *Id.* at 777.

22         There is no dispute that the clearly established federal law here is *Strickland v.*

23   *Washington.*  Thus, "[t]he benchmark for judging any claim of ineffectiveness must be

24   whether counsel's conduct so undermined the proper functioning of the adversarial process

25   that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at

26   686. *Strickland* recognized that "[t]here are countless ways to provide effective assistance

27   in any given case." 466 U.S. at 689. *Strickland* further noted that there comes a point

28   where a defense attorney will reasonably decide that another strategy is in order, thus

11

United States District Court

For the Northern District of California

"mak[ing] particular investigations unnecessary." *Id.* at 691.  Recognizing the "tempt[ation] for a defendant to second-guess counsel's assistance after conviction or adverse sentence," the Court established that counsel should be "strongly presumed to have rendered adequate assistance and made all significant decisions in exercise of reasonable professional judgement." *Id.* at 690.  To overcome that presumption, a defendant must show that counsel failed to act "reasonabl[y] considering all the circumstances." *Id.* at 688.

## 2.   Expert Testimony

Both of the petitioner's ineffective assistance of counsel claims here involve in part failures to introduce expert testimony.  In *Harrington v. Richter*, the Supreme Court denied habeas relief to a petitioner who sought a new trial on the grounds that his counsel provided ineffective assistance "when he failed to present expert testimony on blood evidence." 131 S. Ct. 770, 777 (2011).  The Court found that the expert testimony did not have an apparent value, and, even if it did, "it would be reasonable to conclude that a competent attorney might elect not to use it here, where counsel had reason to question the truth of his client's account." *Id.* at 779.  The Court reasoned that "[a] state court could reasonably conclude that a competent attorney could elect a strategy that did not require using blood evidence experts.  Rare are the situations in which the latitude counsel enjoys will be limited to any one technique or approach." *Id.* at 779.  The Court determined that the state supreme court's summary denial was reasonable under the AEDPA, so habeas relief was not available. *Id.* at 777.

## 3.   Consciousness

Petitioner alleges that "his trial counsel's efforts were deficient in his investigation of potential defenses and preparations for trial, in that counsel failed to elicit testimony from Joseph Adrow, a percipient witness, to the effect that petitioner appeared 'dizzy and disoriented' and was 'shaking his head from side to side' after [the victim] delivered a powerful blow to petitioner's head." Am. Compl. at 21.  And that trial counsel "negligently failed to consult any psychiatric expert to ascertain that petitioner was suffering from post-concussive syndrome following [the victim's] powerful blow to petitioner's head, such that

1    petitioner was rendered unconscious at the time he shot [the victim]." *Id.*

2         Petitioner raised his ineffective assistance claim in the trial court in a motion for a

3    new trial.  The court of appeal set out the background:

4         In support of the motion, the defense presented evidence from Adrow
     that appellant fell to the ground, spun in a circle, shook his head, and
5         appeared "lost" after the received a blow from Parker just seconds before the
     shooting occurred.  Later, in the cab on the way home, appellant seemed
6         "back to himself," and asked Adrow what had happened.  Appellant did not
     remember being hit a second time by Parker inside the Center.  Adrow added
7         that he did not recall any meeting with appellant's counsel before he was
     called as a witness at trial, nor did he describe in his testimony the details of
8         the incident inside the Center, although in his pretrial statement before the
     prosecutor and an investigator from the public defender's office he was given
9         the opportunity to explain "exactly what had happened" during the altercation
     with Parker.  Dr. Martin Blinder, a physician, offered his opinion based upon
10        review of trial transcripts, Adrow's statement, a psychologist's report,
     appellant's medical history of "anxiety disorder" and a 1993 "substantial head
11        injury," along with the interview of appellant and Latasha, the appellant
     suffered a "concussion" and lapse of consciousness when the shooting
12        occurred.  A criminal defense attorney offered expert testimony that he
     thought "there should have at least been an examination of the defendant, the
13        mental capacity of him, the mental aspects of the case."

14        Testimony was also received from appellant's trial counsel that both he
     and the defense investigator interviewed Adrow on several occasions before
15        trial.  Counsel was aware before trial of Adrow's statement that appellant
     received a second blow from Parker inside the Center.  Adrow gave various
16        and inconsistent versions of the incident before his trial testimony, however,
     and his description of "what had happened" was "never clear" to counsel.
17        Trial counsel also repeatedly discussed with appellant the fact that he did not
     recall being hit and knocked down a second time by Parker.  Counsel then
18        explained the reasons for his failure to consult a psychiatrist or submit a
     mental capacity or unconsciousness defense:  Adrow did not appear to be a
19        reliable or credible witness; his testimony was inconsistent, "unrealistic and
     changeable;" in contrast, appellant's description of the entire incident was
20        "crystal clear" and unwavering; in interviews, "there was never any lapse" in
     his "recollection of the events."  Counsel did not detect any "warning bells"
21        that indicated appellant suffered a lapse of consciousness, and thus did not
     pursue the issue.
22
          The trial court denied the first new trial motion for lack of a showing of
23        inadequate assistance of counsel or prejudice.  The court further specially
     found that Adrow lacked credibility in his testimony that he did not consult with
24        defense counsel before trial or have an opportunity to fully present his
     account of the shooting at trial.
25

26   Ex. 7 at 12-13.

27   ///

28        The court of appeal held that "[c]ounsel was justified in concluding that according to

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

appellant's statements, behavior, and account of the shooting, he did not exhibit any signs of a mental state of unconsciousness during the incident, whereas Adrow was an untrustworthy witness." *Id.* at 14.  The court also held that petitioner was not prejudiced, saying:  "Even if we accept the evidence presented by the defense in support of the motion for new trial, a defense of unconsciousness was not in the least persuasive.  Appellant was much better served by focusing the jury's attention on the theories of self-defense and provocation.  Presentation of evidence of unconsciousness would not have altered the result in appellant's favor." *Id.* at 15.

It is well settled that whether and how to present evidence is a matter of trial tactics. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984).  Tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics are known to have been available.  *Id.*  Further, a mere difference of opinion as to trial tactics does not constitute denial of effective assistance.  *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981).  And the United States Supreme Court has never required defense counsel to pursue every nonfrivolous claim or defense, regardless of its merit, viability, or realistic chance of success.  *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1420, 1421-22 (2009).  Thus counsel's abandoning a defense that has "almost no chance of success" is reasonable, even if there is "nothing to lose" by preserving the defense.  *Id.* at 1419-20.

Trial counsel testified at the hearing on the motion that he did not find Adrow to be "a very credible witness."  Ex. 3, Vol. II (Reporter's Transcript) at 1401.  Counsel had discussed with petitioner Coleman the inconsistency between Adrow's version and Coleman's.  *Id.* at 1400.  Trial counsel noted that while the petitioner's "recollection of the events has always been fairly consistent, fairly clear," Adrow's "descriptions have been a little unrealistic and changeable."  *Id.* at 1401.  As a result, he treated petitioner's version of events as the accurate one, and "at no time did it cause me to believe that Mr. Coleman had lost consciousness."  *Id.*  Trial counsel further stated that he did not find Adrow to be a credible witness and in retrospect felt that his testimony had been "more harmful than helpful to [petitioner]."  *Id.*  In short, counsel made an informed tactical decision not to

14

United States District Court

For the Northern District of California

1    present the defense.

2          "*Strickland* specifically commands that a court 'must indulge [the] strong

3    presumption' that counsel 'made all significant decisions in the exercise of reasonable

4    professional judgment." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1407 (2011) (quoting

5    *Strickland*, 466 U.S. at 689-90).  Petitioner has failed to overcome that strong presumption.

6    Counsel's decision not to not to pursue a defense with almost no chance of success was

7    not deficient performance.

8          In addition, given the lack of support for an unconsciousness defense from

9    petitioner himself, and the unlikelihood that the jury would find persuasive a defense based

10   on such a flimsy foundation as Adrow's recollection that petitioner looked dazed, there was

11   not a reasonable likelihood that the outcome would have been different if counsel had used

12   the defense.  The court of appeal's holding that petitioner was not prejudiced was not an

13   unreasonable application of *Strickland*.

14         The state courts' rejection of petitioner's unconsciousness claim was not "contrary

15   to" or "an unreasonable application of clearly established Federal law as determined by the

16   Supreme Court of the United States."  *See* 28 U.S.C. § 2254(d)(1).  He is not entitled to

17   habeas relief on this claim.

18              **4.    Mental Disorder**

19         Petitioner alleges that trial counsels' failure to investigate and present evidence that

20   petitioner was suffering from post-traumatic stress disorder at the time he shot the victim

21   constituted ineffective assistance of counsel.  Am. Compl. at 26.

22         The court of appeal set out the background:

23              We turn to the denial of the second motion for new trial, which was
         predicated on "newly discovered evidence" that appellant suffered "post-
24       traumatic stress disorder at the time he shot the victim."  He offered evidence
         that while incarcerated in Administrative Segregation, or "SHU," at Corcoran
25       State Prison in 1996 and the first half of 1997, he was subjected to hostilities
         among inmates, shootings by correctional officers, and at least one incident of
26       "mutual combat" with another prisoner.  As a result, according to experts who
         conducted a psychiatric evaluation of appellant after trial, he suffered from
27       "SHU Syndrome," characterized by fear and severe anxiety after he was
         released from prison.  The experts theorized that appellant was "terrified" and
28       "shell-shocked" during the confrontation with Parker, and acted according to a

United States District Court
For the Northern District of California

"self-defensive, self-protective reaction."

> Appellant argues that the evidence of post-traumatic stress disorder "could persuade a reasonable jury to convict him of 'involuntary manslaughter rather than voluntary manslaughter." He further accuses his counsel of incompetence for failing to present the evidence at trial, which he submits "could have convinced the jury that appellant acted reflexively when he shot the victim as a result of his hyperalertness, and that he never intended to kill the victim. Consequently, the new evidence may well have persuaded the jury to convict appellant of the lesser offense of involuntary manslaughter."

Ex. 7 at 15-16.

The court considered the ineffective assistance claim:

> As to the claim of ineffective assistance of counsel for failure to produce the evidence, appellant has not discounted a tactical reason for counsel's reliance on self-defense rather than mental incapacity as a trial strategy. . . . We cannot in hindsight question counsel's decision to focus upon self-defense rather than an ambiguous and speculative theory that "SHU Syndrome" refuted proof of appellant's intent. [Citation omitted.] Counsel may have justifiably declined to present evidence that reflected adversely upon appellant's thought processes to avoid undermining the credibility of his testimony and claim of self-defense. Without evidence before us that definitively establishes inexcusable oversight and error rather than informed strategic considerations behind the representation afforded appellant, we cannot find incompetence of counsel. [Citations to California authority omitted.]

Ex. 7 at 17.

A defense attorney's failure to investigate a mental health defense does not constitute deficient performance unless counsel had reason to know that petitioner's mental health might be impaired. *Hoffman v. Arave*, 455 F.3d 926, 932 (9th Cir. 2006), *judgment vacated in part on other grounds by Arave v. Hoffman*, 552 U.S. 117 (2008) (per curiam). Petitioner's trial attorney testified that "there was never any discussion [between petitioner and trial counsel] about violence in prison." Ex. 3, Vol. II at 1432. Further, no one, including petitioner's family, told counsel that petitioner had a psychiatric or psychological problem. *Id.* at 1426. Trial counsel explained that based on his eight years of experience and on his review in this case, "there was never any indication that [petitioner] did not remember something or ... say[ing things] in a way that raises warning bells." *Id.* at 1405. Petitioner thus has failed to show that counsel had any reason to know that petitioner's mental health might be impaired and thus, has failed to overcome the presumption of

**United States District Court**
For the Northern District of California

1    effective performance.

2        The court of appeal also rejected this claim because it concluded that petitioner

3    suffered no prejudice:

4            And in any event, we conclude that the additional expert testimony
         would not have altered the result in appellant's favor.  [Citations to California

5        authority omitted.]  Evidence that due to some form of post-traumatic stress
         disorder appellant acted unreasonably in his response to the threat posed by

6        the victim may have detracted from the self-defense theory, and was not
         convincing to establish lack of intent.  The proffered expert opinion testimony

7        was not that appellant's mental state was incompatible with forming intent to
         kill, but rather that he suffered from anxiety and "hyperalertness" to stimulus.

8        The trial court did not abuse its discretion in finding that there was no
         probability of a different result.

9

10       Because the testimony that petitioner was anxious and hyperalert would not have

11   negated the intent element, petitioner's contention that if counsel had discovered and

12   presented the evidence he would have been convicted of involuntary rather than voluntary

13   manslaughter is meritless, and the testimony would not have been relevant to the self-

14   defense theory, because in California self-defense is judged by an objective standard.

15   Petitioner was not prejudiced.

16       Because counsel's failure to present the mental illness evidence did not constitute

17   deficient performance and because petitioner was not prejudiced by that failure, the state

18   courts' rejection of this claim was not "contrary to" or "an unreasonable application of

19   clearly established Federal law as determined by the Supreme Court of the United States."

20   *See* 28 U.S.C. § 2254(d)(1).  Petitioner is not entitled to habeas relief on this claim.

21       **C.    Eighth Amendment**

22       Petitioner claims that his sentence of fifty-nine years to life under the three strikes

23   law was grossly disproportionate to the crime, and so constituted cruel and unusual

24   punishment.

25       The Eighth Amendment to the United States Constitution provides that there "shall

26   not be . . . cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  "The Eighth

27   Amendment does not require strict proportionality between crime and sentence.  Rather, it

28   forbids only extreme sentences that are 'grossly disproportionate' to the crime."  *Ewing v.*

United States District Court

For the Northern District of California

1    *California*, 538 U.S. 11, 23 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001

2    (1991) (Kennedy, J., concurring)); *see also Lockyer v. Andrade*, 538 U.S. 63, 72 (2003) ("A

3    gross disproportionality principle is applicable to sentences for terms of years."). The

4    Eighth Amendment does not preclude a state from making a judgment that protecting the

5    public safety requires incapacitating criminals who have already been convicted of at least

6    one serious or violent crime, as may occur under a recidivist sentencing statute. *Ewing*,

7    538 U.S. at 25, 29-30.

8        In determining whether a sentence is grossly disproportionate under a recidivist

9    statute, the court looks to whether the "extreme sentence is justified by the gravity of [the

10   individual's] most recent offense and criminal history." *Ramirez v. Castro*, 365 F.3d 755,

11   768 (9th Cir. 2004). The court's rationale is simple: Society is warranted in imposing

12   increasingly severe penalties on repeat criminal offenders. "[A]t some point in the life of

13   one who repeatedly commits criminal offenses serious enough to be punished as felonies,"

14   it is may be necessary "to segregate that person from the rest of society for an extended

15   period of time." *Rummel v. Estelle*, 445 U.S. 263, 284-85 (1980).

16       In *Andrade*, the Supreme Court upheld a Three Strikes sentence of two consecutive

17   twenty-five-to-life terms for a recidivist convicted of stealing approximately $150 worth of

18   videotapes. *Andrade*, 538 U.S. at 66, 77. Andrade had a criminal history of petty theft,

19   burglary, and transportation of marijuana. *Id.* at 66. Similarly, in *Ewing*, the Court upheld a

20   Three Strikes sentence of twenty-five years to life for a repeat felon convicted of felony

21   grand theft of three golf clubs worth nearly $1,200. *Ewing*, 538 U.S. at 18-19, 30-31.

22   Ewing had a criminal history of theft, battery, burglary, possession of drug paraphernalia,

23   illegal firearm possession, robbery, and trespass. *Id.* at 18-19. By contrast, the Ninth

24   Circuit in *Ramirez* held that a Three Strikes sentence of twenty-five years to life on petty

25   theft with prior conviction was grossly disproportionate to the crime. *Ramirez*, 365 F.3d at

26   767. Ramirez's prior criminal history consisted of two convictions for second-degree

27   robbery obtained through a single guilty plea, for which his total sentence was one year in

28   county jail and three years of probation. *Id.* at 768. The robberies were "nonviolent"

United States District Court

For the Northern District of California

1  shoplifting crimes in which the "force" used was when a third party drove the getaway car

2  over the foot of a grocery store security guard and when Ramirez pushed a K-mart security

3  guard out of his way as he fled the store.  *Id.*

4         Here, petitioner was convicted of voluntary manslaughter, a crime much more

5  serious than the thefts in *Andrade* and *Ewing*.  In determining whether a sentence is

6  grossly disproportionate under a recidivist sentencing statute, however, courts look not only

7  at the most recent offense, but also at the petitioner's criminal history.  *Ramirez*, 365 F.3d

8  at 768.  Unlike in *Ramirez*, where Ramirez's two prior strikes were nonviolent shoplifting

9  crimes, *Id.* at 763, the petitioner here had a "history of [ ] violent conduct, which continued

10  and escalated in severity to the present homicide offense." Ex. 7 at 19.  Petitioner's

11  previous violent conduct included a prior plea to sexual battery and prior conviction for

12  attempted robbery and burglary, with use of a gun.  *Id.*  Furthermore, petitioner had only

13  been released from prison two weeks prior to his current offense. Ex. 3, Vol. I at 38.  This

14  history of violent conduct, as well as his use of a firearm in past and present offenses, his

15  prior plea to a sexual battery, and his repeated possession and use of firearms lead the trial

16  court to conclude that the petitioner "is clearly not outside the spirit of the Three Strikes

17  sentencing scheme." Ex. 7 at 19.  Under these circumstances, the sentence of fifty-nine

18  years to life is not one of the "exceedingly rare" and "extreme" cases that violate the

19  principle of gross disproportionality, and the sentence cannot therefore constitute cruel and

20  unusual punishment. *See Andrade*, 538 U.S. at 73.

21         If the sentences in *Ewing* and *Andrade* were not grossly disproportionate, the

22  sentence here certainly was not.  Because petitioner's sentence did not violate the Eighth

23  Amendment, the state court's rejection of this claim was not "contrary to," or "an

24  unreasonable application of, clearly established Federal law as determined by the Supreme

25  Court of the United States." *See* 28 U.S.C. § 2254(d)(1).  Petitioner is not entitled to

26  habeas relief on this claim.

27  ///

28         **D.     Double Jeopardy**

United States District Court

For the Northern District of California

### 1.   Consecutive Sentences

Petitioner challenges the trial court's application of the mandatory consecutive sentencing provision of California's Three Strikes law to his two convictions.  Petitioner asserts that these offenses occurred on the "same occasion" and "shared the same set of operative facts," thereby precluding mandatory consecutive sentences.  Thus, petitioner contends that imposition of the consecutive sentences violated his constitutional rights.

The Double Jeopardy Clause of the Fifth Amendment guarantees that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  The Supreme Court in *Benton v. Maryland*, 395 U.S. 784, 794 (1969), held that the Clause's protections were applicable to the states through the Fourteenth Amendment.  The guarantee against double jeopardy protects against (1) a second prosecution for the same offense after acquittal or conviction, and (2) multiple punishments for the same offense.  *Witte v. United States*, 515 U.S. 389, 395-96 (1995).

Courts may, however, impose multiple punishments for the same conduct without violating the double jeopardy clause if there are two separate offenses.  *United States v. Mathews*, 36 F.3d 821, 823 (9th Cir. 1994).  The double jeopardy clause is not violated if "each [offense] requires proof of a fact which the other does not."  *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  *Id.*

In *Dubois v. Hocker*, the Ninth Circuit denied a similar habeas petition in which petitioner challenged convictions for carrying a concealed weapon and discharging a firearm in a public place arising from the same set of facts.  432 F.2d 549 (9th Cir. 1970).  The court there found no double jeopardy violation because the offenses, despite the fact that they were close in time and that a gun was common to all of them, "were not identical. [Petitioner] still could have been guilty of [one offense] without being guilty of [the other offense]."  *Id.* at 549-50.

United States District Court
For the Northern District of California

1    Similarly here, the elements of possession of a firearm by a felon differ from the

2   elements of voluntary manslaughter.  The crime of possession of a firearm by an ex-felon

3   was committed the moment petitioner had the firearm in his possession, while voluntary

4   manslaughter involves additional elements, most notably a killing.  Ex. 7 at 23.  Although

5   these crimes were part of the same course of conduct, they were two separate offenses

6   under the *Blockburger* test and therefore separate, consecutive punishments could be

7   imposed for these offenses without violating the Double Jeopardy clause of the Fifth

8   Amendment.  The court's imposition of consecutive sentences was not contrary to, or an

9   unreasonable application of, clearly established federal law.

10                    **2.     Firearm Enhancement**

11    Petitioner claims that his right not to be subjected to double jeopardy was violated by

12   his sentence on the firearm enhancement.

13    "With respect to cumulative sentences imposed in a single trial, the Double

14   Jeopardy Clause does no more than prevent the sentencing court from prescribing greater

15   punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983);

16   *see also Plascencia v. Alameida*, 467 F.3d 1190, 1204 (9th Cir. 2006) ("The key to

17   determining whether multiple charges and punishments violate double jeopardy is

18   legislative intent.").  Sentencing enhancements that increase the penalty for a crime based

19   on the offender's conduct do not offend double jeopardy where "a legislature specifically

20   authorizes cumulative punishment under two statutes . . . ." *Hunter*, 459 U.S. at 368.

21    The Ninth Circuit has held that Penal Code § 12022.53(d), a companion firearm

22   enhancement statute to Penal Code § 12022.5(a), does not violate double jeopardy stating:

23   "Here, the language of California Penal Code § 12022.53 is clear.  Subsection (d) provides

24   for a 25 year enhancement when a "firearm is used" to commit murder.  There is, therefore,

25   no question as to what the California legislature intended . . . . [T]he California legislature

26   has simply determined that a "criminal offender may receive additional punishment for any

27   single crime committed with a firearm."  Accordingly, we reject [the petitioner's] double

28   jeopardy argument." *Plascencia*, 467 F.3d at 1204.  The same reasoning applies to section

United States District Court

For the Northern District of California

1  12022.5(a), which provides:  "Except as provided in subdivision (b), any person who

2  personally uses a firearm in the commission of a felony or attempted felony shall be

3  punished by an additional and consecutive term of imprisonment in the state prison for 3, 4,

4  or 10 years, unless use of a firearm is an element of that offense."  Cal. Penal Code §

5  12022.5(a) (2012).  Given the similarity of the statutory provisions, there is "no question"

6  here that, as in *Plascencia*, the California legislature intended to impose additional

7  punishment on defendants who personally discharge a firearm in connection with the

8  commission of a felony.  The sentence enhancement did not violate double jeopardy.  *See*

9  *Plascencia*, 467 F.3d at 1204.

10      Accordingly, the state appellate court's rejection of this claim was neither contrary to,

11  nor an unreasonable application of, clearly established federal law.  Petitioner is not entitled

12  to habeas relief on this claim.

13  **II.     Appealability**

14      The federal rules governing habeas cases brought by state prisoners require a

15  district court that denies a habeas petition to grant or deny a certificate of appealability

16  ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. §

17  2254 (effective December 1, 2009).

18      A petitioner may not appeal a final order in a federal habeas corpus proceeding

19  without first obtaining a COA.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge

20  shall grant a COA "only if the applicant has made a substantial showing of the denial of a

21  constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues

22  satisfy this standard.  *See id.* § 2253(c)(3).  "Where a district court has rejected the

23  constitutional claims on the merits, the showing required to satisfy § 2253(c) is

24  straightforward: The petitioner must demonstrate that reasonable jurists would find the

25  district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

26  *McDaniel*, 529 U.S. 473, 484 (2000).

27  ///

28      This was not a close case.  For the reasons set out above, jurists of reason would

1  not find the result debatable or wrong.  A certificate of appealability will be denied.

2  Petitioner is advised that he may not appeal the denial of a COA, but he may ask the court

3  of appeals to issue a COA under Rule 22 of the Federal Rules of Appellate Procedure.

4  *See* Rule 11(a), Rules Governing § 2254 Cases.

### CONCLUSION

6  For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

7  A Certificate of Appealability also is **DENIED**.  *See* Rule 11(a) of the Rules Governing

8  Section 2254 Cases (eff. Dec. 1, 2009).

9  The clerk shall close the file.

10  **IT IS SO ORDERED.**

11  Dated:  March 16, 2012.

_____
PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.04\COLEMAN069.RUL.wpd

United States District Court
For the Northern District of California